[Cite as *State v. Thomas*, 2015-Ohio-3226.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 101797**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## ROBERT LAMAR THOMAS

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-13-579375-A

**BEFORE:** E.T. Gallagher, J., Jones, P.J., and Blackmon, J.

**RELEASED AND JOURNALIZED:** August 13, 2015

**ATTORNEY FOR APPELLANT**

J. Charles Ruiz-Bueno
Charles Ruiz-Bueno Co., L.P.A.
36130 Ridge Road
Willoughby, Ohio 44094


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY:    Edward R. Fadel
Assistant Prosecuting Attorney
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

EILEEN T. GALLAGHER, J.:

{¶1} Defendant-appellant, Robert Lamar Thomas ("Thomas"), appeals from his convictions and sentence following a jury trial. Thomas raises four assignments of error for review:

1. Defendant-appellant was prejudiced by the ineffective assistance of his trial counsel.

2. The trial court committed prejudicial error by admitting evidence in contravention to the Ohio Rules of Evidence.

3. The evidence adduced at trial was insufficient to sustain a verdict against defendant-appellant.

4. The trial court committed prejudicial error by sentencing defendant-appellant to an excessive term of imprisonment.

{¶2} After careful review of the record and relevant case law, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I. Procedural and Factual History

{¶3} On October 31, 2013, Thomas was named in a 19-count indictment, charging him with 11 counts of rape in violation of R.C. 2907.02(A)(1)(b), with a furthermore specification that Thomas purposely compelled 12-year-old victim, H.W., to submit by force or threat of force; seven counts of kidnapping in violation of R.C. 2905.01(A)(4), with sexual motivation specifications; and one count of disseminating matter harmful to juveniles in violation of R.C. 2907.31(A)(3). The indictment specified that Thomas engaged in sexual conduct with H.W. on separate occasions from August 15, 2012

through October 31, 2012. On June 13, 2014, a jury trial commenced where the following evidence was adduced.

{¶4} S.W. ("Mother"), testified that she is the mother of four children including H.W. Mother stated that she was in an "on and off" relationship with Thomas for over six years. During the times relevant to this case, Thomas was residing with Mother and her children and was given the responsibility to watch her children while she worked nights as a bartender.

{¶5} H.W., born July 7, 2000, suffers from PHACE syndrome[1] and has experienced "social problems" since she was a young girl due to her health condition. Mother testified that she began to notice further changes in her daughter's demeanor just as H.W. was entering her sixth-grade school year. Specifically, H.W. had become increasingly argumentative and withdrawn.

{¶6} In October 2012, Mother went to her daughter, then 12 years old, to discuss her recent behavior. According to Mother, H.W. immediately began to cry and stated that she was having sex with Thomas in the house. Mother testified that she "freaked out" and confronted Thomas, who denied the allegations. Thereafter, Mother attempted to take H.W. to the hospital. H.W., however, recanted her allegations against Thomas before they left the house.

---

[1] PHACE syndrome is the association of a large hemangioma, usually on the face or neck, in combination with one or more other birth defects. People with PHACE syndrome may have posterior fossa brain malformations, hemangioma, arterial lesions (blood vessel abnormalities in the head or neck), cardiac (heart) abnormalities/aortic coarctation, and eye abnormalities.

{¶7} In the weeks that followed, H.W. continued to exhibit signs of emotional instability. Her sleep patterns were irregular, she was depressed and withdrawn, and did not want to shower. Mother testified that H.W. continued to go "back and forth" on her accusations against Thomas. As a result, Mother scheduled an appointment with H.W.'s psychiatrist. During this time period, Thomas was living in the house, but "disappeared" two days before H.W. was scheduled to meet with her psychiatrist to address her ongoing behavioral issues. In November 2012, Mother was urged by H.W.'s psychiatrist to notify the police of the accusations.

{¶8} On cross-examination, Mother was questioned at length about several instances where H.W. had demonstrated untruthfulness. Significantly, Mother confirmed that when H.W. was in the fourth grade she alleged that a boy in her class had inappropriately touched her in the bathroom, but later admitted that she had "made it up." H.W. also lied to her mother about being on a dating website and had previously lied to school officials that Mother was abusing her at home.

{¶9} H.W. testified that in August 2012, just before she entered the sixth grade, Thomas began "sexually abusing [her]." Throughout her testimony, H.W. described six specific instances of sexual abuse.

{¶10} H.W. stated that the first incident occurred after she had a bad dream and went downstairs to talk to Thomas. H.W. told Thomas that it was a "sexual dream" and that the man in the dream "made [her] bleed." Thereafter, Thomas and H.W. went into the kitchen while talking about her dream. Thomas walked up to H.W. and touched her

stomach while standing face-to-face. H.W. testified that Thomas made her feel nervous and confused. Thomas then took H.W. upstairs to his bedroom and put on a pornographic video. While the video was playing, Thomas began to rub H.W.'s leg. Thomas then took off H.W.'s pants and underwear and touched her legs and vagina with his hand. H.W. testified that she felt "frozen." H.W. stated that Thomas made her give him oral sex and then put his penis in her vagina. Additionally, Thomas "licked [her] breasts and vagina." H.W. stated that he had slurred speech during this incident.

{¶11} The day after the first incident was H.W.'s first day of the sixth grade at school. H.W. testified that Thomas picked her up from school and stated that what they did the night before was wrong and that they should not do it again. However, the following day, Thomas woke H.W. up while Mother was at work and "put his penis in [her] vagina." H.W. stated that she held her favorite stuffed animal, Amy, during this assault. H.W. testified that she could not remember if anything came out of Thomas's penis but that he used a rag to wipe off her sheets when he was finished.

{¶12} The third incident H.W. described occurred in the downstairs living room. H.W. testified that Thomas "put his penis in my mouth" while her brother and sisters were upstairs. H.W. testified that Thomas ejaculated and "stuff" ended up on the carpet in the living room.

{¶13} The fourth incident occurred while H.W. was packing clothes in the basement to visit her father. H.W. testified that Thomas came down to the basement and "had sex with [her] on the dirty clothes."

{¶14} Finally, H.W. testified that Thomas sexually abused her twice in the same day. She first indicated that Thomas had vaginal sex with her in her mother's bedroom. The second incident she referred to was later that night when Thomas woke her up while she was sleeping in her bed. H.W. remembered that "Nick at Nite" was playing on the television in her bedroom when Thomas woke her up. H.W. stated that Thomas's "mouth and penis touched [her] vagina." Thomas also rubbed her vagina with his finger.

{¶15} H.W. stated that she first disclosed these incidents to Mother while she was in her bedroom. H.W. could not remember what led her to tell her mother about the sexual abuse. H.W. testified her mother was "shocked" and immediately confronted Thomas. According to H.W., Thomas denied the allegations, which made her feel "mad."

{¶16} On December 3, 2012, the Lakewood Police Department commenced its investigation into the allegations raised against Thomas. After speaking with Mother and H.W., the police collected evidence from the house, including H.W.'s bedding. The following day, Officer Nicholas Rebraca ("Officer Rebraca") returned to collect a bed sheet that Mother alleged had not been washed since the time of the incidents. Subsequently, Detective Larry Kirkwood ("Det. Kirkwood") returned to the residence to cut a piece of carpet from Mother's living room for forensic analysis.

{¶17} Christine Scott ("Scott"), a forensic scientist employed with the Cuyahoga County Medical Examiner's Office, testified that she specializes in forensic DNA

analysis. Scott stated that she performed a DNA analysis on several items submitted by the Lakewood Police Department, including carpet from the living room and a comforter, bed sheet, pillow case, and bed skirt from H.W.'s bed. In her forensic report, Scott found that no seminal material was detected in the carpet from the living room, or on H.W.'s comforter, pillow case, or bed skirt. However, Scott testified that seminal material was identified on a section of H.W.'s bed sheet. Scott compared the seminal material found on the bed sheet to the buccal swab standard taken from Thomas and concluded that "the DNA profile obtained from the sperm fraction on [H.W.'s bed sheet] matches the DNA profile of [Thomas]" to "a reasonable degree of scientific certainty."

{¶18} With regards to the same cutting from the bed sheet, epithelial fractions were tested for DNA. Scott explained that epithelial fractions "contain all the cells from your body such as skin cells" and "cells from vaginal secretions." Scott testified that the DNA profile obtained from the epithelial fraction was a mixture of major and minor contributors. The major contributor matched the profile of Thomas. Further, Scott concluded that, after comparing the DNA profile of the minor contributor to the buccal swab standards taken from Mother and H.W., H.W. could not be excluded as the minor contributor. Mother was excluded as the minor contributor.

{¶19} Deana Davis ("Davis") testified that she is employed as a social worker with the Division of Children and Family Services and was assigned to H.W.'s case in December 2012. Davis testified that she met with H.W. on two separate occasions and discussed H.W.'s initial disclosure to her mother and relevant details of each incident of

sexual abuse. According to Davis, H.W. had a difficult time discussing the sexual abuse and had a "flat affect." Davis testified that her primary goal was to make the appropriate mental health referrals to help H.W. cope with the trauma and move forward in life.

{¶20} In the course of completing her assessment in this case, Davis collected background information into H.W.'s mental and physical health and learned that H.W. made suicide attempts after the sexual abuse allegedly occurred. Davis testified that the severity of H.W.'s mental health issues caused her to be hospitalized on two separate occasions.

{¶21} Dr. Mark Feingold ("Dr. Feingold") is employed by MetroHealth Medical Center and is a member of the Department of Pediatrics and the Director of Child Protection Services. Dr. Feingold testified that he met with H.W. and her mother on December 17, 2012, to assess H.W.'s allegations of sexual abuse. Dr. Feingold testified that he received notable background information, including H.W.'s struggle with PHACE syndrome. During the evaluation, Dr. Feingold was informed that H.W. was abused six to seven times in various rooms of the house. H.W. stated that she did not bleed but that it hurt when she urinated after the abuse and her stomach would hurt. Dr. Feingold testified that this was a noteworthy disclosure because a 12-year-old child would not normally describe this pain unless abuse had taken place.

{¶22} At the conclusion of trial, the jury found Thomas guilty of rape as indicted in Counts 1, 2, 5, 12, and 13, and that he committed the acts by purposely compelling H.W. to submit by force or threat of force. Thomas was also found guilty of kidnapping

with sexual motivation specifications as indicted in Counts 3, 6, and 14.  He was found not guilty of all remaining counts.

**{¶23}** At sentencing, the trial court merged Thomas's kidnapping and rape convictions.  The state elected to proceed with sentencing on the rape convictions, and Thomas was sentenced to 25 years to life on each count.  Four of the rape convictions were run concurrently to each other, but consecutive to the fifth rape conviction, for a total term of imprisonment of 50 years to life.

**{¶24}** Thomas now appeals from his convictions and sentence.

## II. Law and Analysis

### A.  Ineffective Assistance of Counsel

**{¶25}** In his first assignment of error, Thomas argues he received ineffective assistance of counsel throughout the trial proceedings.

**{¶26}** To establish ineffective assistance of counsel, Thomas must demonstrate that (1) counsel's representation was deficient in that it "fell below an objective standard of reasonableness," and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Sanders*, 94 Ohio St.3d 150, 151, 761 N.E.2d 18 (2002).  In Ohio, an attorney properly licensed is presumed competent.  *State v. Lott*, 51 Ohio St.3d 160, 174, 555 N.E.2d 293 (1990).  The defendant has the burden of proof and must overcome the strong

presumption that counsel's performance was adequate or that counsel's action might be sound trial strategy. *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985).

**{¶27}** Thomas first argues that defense counsel was ineffective for failing to "reasonably communicate with him regarding his rights and the full gamut of defenses and mitigation that could be taken." After careful review, there is no evidence in the record to prove or disprove Thomas's assertions. In the absence of evidence on the record to suggest otherwise, we must presume defense counsel adequately communicated with Thomas throughout this case. *In re C.B.*, 9th Dist. Lorain No. 14CA010588, 2014-Ohio-4618, ¶ 10. Accordingly, this issue is unresolvable on direct appeal because it requires evidence outside the record. *State v. Burton*, 8th Dist. Cuyahoga No. 100716, 2014-Ohio-4207, ¶ 14, citing *State v. Rivas*, 8th Dist. Cuyahoga No. 100044, 2014-Ohio-833, ¶ 10.

**{¶28}** Next, Thomas asserts that his best interests were not taken into account. Thomas contends that defense counsel "failed to file requested motions, such as to inspect the grand jury transcript or to exclude the bed sheet that was provided after the police investigation of the scene had concluded."

**{¶29}** Generally, grand jury proceedings are secret, and an accused is not entitled to inspect grand jury transcripts during trial unless the ends of justice require it, and the defense shows that a particularized need for disclosure exists that outweighs the need for secrecy. *State v. Davis*, 38 Ohio St.3d 361, 528 N.E.2d 925 (1988); *State v. Greer*, 66 Ohio St.2d 139, 420 N.E.2d 982 (1981). A "particularized need" exists when

circumstances reveal a probability that the failure to provide grand jury testimony will deny the accused a fair trial. *Id.* From the record, we are unable to determine to what extent the grand jury testimony would have benefitted counsel in his efforts to cross-examine state's witnesses. Further, Thomas has provided no basis for this court to conclude he was denied a fair trial without the grand jury transcripts. Thus, we are unable to conclude that counsel's failure to seek the witnesses' grand jury testimony constituted ineffective assistance.

{¶30} Moreover, Thomas has not established that defense counsel's failure to file a motion to exclude the bed sheet from evidence fell below an objective standard of reasonable representation. Thomas has not articulated a legal basis for excluding the bed sheet. The record demonstrates that the bed sheet was lawfully recovered from Mother's home by the Lakewood police following its investigation into the allegations raised by H.W. Under these circumstances it is probable, and reasonable, for trial counsel to conclude that a motion to exclude the evidence would have been futile and strategically flawed. *See State v. Morton*, 8th Dist. Cuyahoga No. 100267, 2014-Ohio-1434, ¶ 12.

{¶31} Finally, Thomas argues defense counsel was ineffective for failing to subpoena certain medical health professionals, including a DNA expert provided by the trial court at the state's expense, and a physician at Fairview Hospital whom Thomas claims performed a medical examination on H.W. However, the decision whether to subpoena or call a witness falls squarely within the ambit of trial strategy and does not

constitute ineffective assistance absent a showing of prejudice. *State v. Oliver*, 101 Ohio App.3d 587, 594, 656 N.E.2d 348 (8th Dist.1995). Without more information, this court has no basis to know how these medical professionals would have testified. *See State v. Short*, 129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, ¶ 119. Presumably, defense counsel weighed all relevant factors and determined that the testimony would not have benefitted Thomas at trial. Accordingly, Thomas cannot demonstrate the requisite level of prejudice necessary to overcome counsel's trial strategy.

{¶32} Thomas's first assignment of error is overruled.

## B. Evidence

{¶33} In his second assignment of error, Thomas argues the trial court committed prejudicial error by admitting evidence in contravention of the Ohio Rules of Evidence.

{¶34} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus. An appellate court, therefore, generally reviews a trial court's decision pertaining to the admission of evidence for an abuse of discretion. *State v. Gale*, 8th Dist. Cuyahoga No. 94872, 2011-Ohio-1236, ¶ 12, citing *State v. Finnerty*, 45 Ohio St.3d 104, 107, 543 N.E.2d 1233 (1989). An abuse of discretion implies that the trial court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶35}** As Thomas concedes, however, counsel did not object to the testimony challenged within this assignment of error. Thus, our review is limited to plain error. *State v. Jackson*, 92 Ohio St.3d 436, 444, 751 N.E.2d 946 (2001), citing *State v. Underwood*, 3 Ohio St.3d 12, 444 N.E.2d 1332 (1983), syllabus; Crim.R. 52(B). An appellate court recognizes plain error with the utmost caution, under exceptional circumstances, and only to prevent a miscarriage of justice. *State v. Pilgrim*, 184 Ohio App.3d 675, 2009-Ohio-5357, 922 N.E.2d 248, ¶ 58 (10th Dist.), citing *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 139.

**{¶36}** For an error to be a "plain error" under Crim.R. 52(B), it must satisfy three prongs (1) there must be an error, meaning a deviation from a legal rule, (2) the error must be "plain," meaning an "obvious" defect in the trial proceedings, and (3) the error must have affected "substantial rights," meaning the error must have affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240.

**{¶37}** Thomas argues that the trial court erred by admitting hearsay testimony. He first challenges the portion of Mother's testimony in which she recounted what H.W. said to her in October 2012 about the sexual abuse. More specifically, Thomas argues the following statements made by Mother were impermissible hearsay:

She was crying and shaking, like she didn't want to tell me.

* * *

She told me that she — somebody in the house — she was having sex with somebody in the house. Like she had sex with somebody in the house. And she told me that it was him, Bobby."

**{¶38}** Similarly, Thomas challenges Officer Rebraca's testimony that, in the course of his investigation, Mother stated that H.W. had disclosed that she was having sex with Thomas while Mother was at work. Thomas contends that the testimony was "double hearsay."

**{¶39}** Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Pursuant to Evid.R. 802, hearsay is inadmissible unless it falls within an exception provided by the rules of evidence. Should hearsay statements be admitted improperly, however, such error does not necessarily require reversal of the outcome of the trial if it was harmless. *See Arizona v. Fulminante*, 499 U.S. 279, 306-309, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

**{¶40}** After careful review, we find the challenged testimony contained hearsay statements. However, without determining whether the statements fall under one of the enumerated exceptions to the hearsay rule, we find the trial court's admission of the hearsay testimony to be harmless. The main premise behind the hearsay rule is that the adverse party is not afforded the opportunity to cross-examine the declarant. *See State v. Primeau*, 8th Dist. Cuyahoga No. 97901, 2012-Ohio-5172, ¶ 69. In this case, H.W. testified at trial and was subjected to cross-examination about the conversation she had

with her mother and her possible motives for making a false allegation against Thomas. Thus, Mother and Officer Rebraca's testimony was cumulative and harmless beyond a reasonable doubt. *State v. Simmons*, 8th Dist. Cuyahoga No. 98613, 2013-Ohio-1789, ¶ 28, citing *State v. Greer*, 8th Dist. Cuyahoga No. 91983, 2009-Ohio-4228, ¶ 59.

**{¶41}** Thomas next challenges the state's question during the redirect examination of H.W. concerning whether she was married to Thomas at the time of the sexual abuse. Thomas contends that the question was beyond the scope of cross-examination and was only asked to cure the state's failure to establish a necessary element of R.C. 2907.02(A)(1) during its case-in-chief. As a general rule, the scope of redirect examination is limited to matters inquired into by the adverse party on cross-examination. *State v. Wilson*, 30 Ohio St.2d 199, 204, 283 N.E.2d 632 (1972).

**{¶42}** After careful review of the record in its entirety, we are unable to conclude that the trial court committed plain error by failing to restrict the scope of redirect examination. Mother's testimony contained numerous references to her romantic relationship with Thomas, and H.W. testified that Thomas was her mother's boyfriend. Thus, notwithstanding the prosecutors question during redirect examination, we find credible evidence in other portions of the record to establish that H.W. was not Thomas's spouse at the time the sexual abuse occurred. Any perceived error in permitting the prosecution to question H.W. about her marital status during redirect examination is therefore harmless.

{¶43} Finally, Thomas argues the trial court committed prejudicial error by allowing social worker, Deana Davis, to make a statement of ultimate opinion. Specifically, Thomas challenges Davis's affirmative answer when she was asked whether H.W.'s suicidal attempts began after the sexual abuse occurred. Thomas claims that Davis's response was "in direct contravention of the Ohio Rules of Evidence" because it was "tantamount to a social worker's expert opinion that Thomas's abuse caused H.W. to have suicidal behavior."

{¶44} After reviewing the context in which the challenged statement was made, we disagree with Thomas's characterization of Davis's testimony. At the time Davis was questioned about H.W.'s suicide attempts, she was discussing the relevant information she considered in assessing H.W.'s case, including H.W.'s medical history in the months following her disclosure of the sexual abuse. Thus, Davis's testimony that H.W. attempted suicide after the sexual abuse was alleged to have occurred did not amount to an expert opinion regarding an ultimate issue. Instead, Davis's testimony was a statement of fact based on her review of H.W.'s medical history and background information. Accordingly, we find no error, plain or otherwise.

{¶45} Thomas's second assignment of error is overruled.

### C. Sufficiency and Manifest Weight of the Evidence

{¶46} In his third assignment of error, Thomas argues his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence.

{¶47} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶48} In contrast to sufficiency, "weight of the evidence involves the inclination of the greater amount of credible evidence." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). While "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins* at 386-387. The reviewing court must consider all the evidence in the record, the reasonable inferences, and the credibility of the witnesses, to determine whether, "'in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶49} We are mindful that the weight to be given the evidence and the credibility of the witnesses are matters primarily for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact has

the authority to "believe or disbelieve any witness or accept part of what a witness says and reject the rest." *State v Antill*, 176 Ohio St.61, 67, 197 N.E.2d 548 (1964). "The choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986).

{¶50} In this case, Thomas was found guilty of five counts of rape in violation of R.C. 2907.02(A)(1)(b), which states in relevant part:

> No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person.

{¶51} "Sexual conduct" means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. R.C. 2907.01(A). Penetration, however slight, is sufficient to complete vaginal or anal intercourse. *Id.*

{¶52} Thomas's rape counts contained a furthermore clause that Thomas purposely compelled H.W. to submit by force or threat of force. R.C. 2901.01(A)(1) defines "force" as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." To establish the element of force in a rape case involving a minor child when the offender stands in a position of authority, neither express threat of harm nor evidence of significant physical restraint need be proven. *State v. Dye*, 82 Ohio St.3d 323, 695 N.E.2d 763 (1998), paragraph one of the syllabus.

Instead, it is the position of authority and power, in relationship with the child's vulnerability, that creates a unique situation of dominance and control in which explicit threats and displays of force are unnecessary. *State v. Eskridge*, 38 Ohio St.3d 56, 526 N.E.2d 304 (1988), paragraph one of the syllabus. Thomas held a position of authority over H.W. by virtue of his relationship to H.W.'s mother and as the babysitter while H.W.'s mother was at work.

{¶53} Thomas was also found guilty of three counts of kidnapping in violation of R.C. 2905.01(A)(4), which states in relevant part:

> No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person * * * [t]o engage in sexual activity * * * with the victim against the victim's will.

{¶54} As determined by the jury, Thomas's convictions related to three separate instances of sexual abuse (1) the first instance of abuse in Mother's bedroom involving vaginal sex and cunnilingus (Counts 1, 2, and 3), (2) the second instance of abuse in H.W.'s bedroom after her first day of sixth grade (Counts 5 and 6), and (3) a subsequent instance of abuse in H.W.'s bedroom involving vaginal sex and digital penetration (Counts 12, 13, and 14).

{¶55} In challenging the evidence supporting his convictions, Thomas does not argue that the prosecution failed to prove any of the necessary elements to sustain his convictions. Instead, Thomas contends that his convictions were based on the testimony of a untrustworthy victim — a matter not appropriate for a sufficiency challenge. Indeed, "in a review of the sufficiency of the evidence, the court does not engage in a

determination of the witnesses' credibility." *State v. Goff*, 82 Ohio St.3d 123, 135, 694 N.E.2d 916 (1998). Nonetheless, we find that Thomas's convictions were supported by sufficient evidence.

{¶56} H.W. provided detailed testimony concerning three separate incidents where Thomas, while acting as an authoritative figure, engaged in sexual conduct with her while she was 12 years old. H.W. testified that the incidents took place in her mother's bedroom and in her bedroom and involved vaginal sex, digital penetration, and cunnilingus. Moreover, forensic scientist Scott testified that the DNA profile obtained from a sperm fraction found on H.W.'s bed sheet matched Thomas's DNA profile. Similarly, Scott testified that the DNA profile obtained from epithelial fractions found on the bed sheet were the mixture of two individuals. Scott testified that Thomas's DNA profile was a major contributor and that H.W. could not be excluded as a possible source of the DNA profile in the minor contributor.

{¶57} Viewing the foregoing evidence in a light most favorable to the prosecutions, we find a rational trier of fact could have found Thomas guilty beyond a reasonable doubt on the charges of rape and kidnapping.

{¶58} Moreover, we are unable to conclude that Thomas's convictions were against the manifest weight of the evidence. As stated, Thomas argues that his convictions were the product of false testimony and unreliable DNA evidence. He claims that the testimony of H.W. was "wrought with unreliability" where she admitted to a pattern of lying to gain attention and recanted her allegations after she first disclosed the

sexual abuse to her mother. Thomas further contends that DNA evidence was "flawed" because it may have been compromised while it was in the basement for over 30 days. He submits that it is possible that a separate piece of laundry containing his DNA, such as his own clothing or bedding, may have touched H.W.'s bed sheet while it was in a pile of dirty clothes in the basement.

{¶59} Although Thomas maintains his innocence, the jury, as the trier of fact, was in the best position to weigh the credibility of the witnesses and was free to find H.W.'s testimony to be credible. Issues concerning H.W.'s credibility were raised by defense counsel throughout the trial. Specifically, the jury was presented with information concerning specific instances where H.W. made false statements to authoritative figures. Furthermore, defense counsel questioned Scott at length during cross-examination about the potential contamination of the bed sheet while it was in the basement. In fact, Scott admitted that it is possible for DNA to be transferred onto one item from another article of clothing if, for example, they touched while inside a laundry basket. Thus, the jury was presented with all relevant information when weighing the arguments raised by each side, but, ultimately rejected Thomas's position. Deferring to the jury's assessment of credibility, as we must, we cannot say that the jury clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered.

{¶60} Thomas's third assignment of error is overruled.

## D. Sentence

**{¶61}** In his fourth assignment of error, Thomas argues the trial court committed prejudicial error by sentencing him to an excessive term of imprisonment. He contends that the imposition of a consecutive sentence was the product of judicial bias based on the trial court's unhappiness with Thomas's statements during the sentencing hearing.

**{¶62}** "Judicial bias is defined as 'a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and facts.'" *State v. Miller*, 6th Dist. Lucas No. L-08-1314, 2009-Ohio-3908, ¶ 20, quoting *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 34. "A trial judge is 'presumed not to be biased or prejudiced, and the party alleging bias or prejudice must set forth evidence to overcome the presumption of integrity.' *Weiner v. Kwiat*, 2d Dist. Montgomery No. 19289, 2003-Ohio-3409, ¶ 90, quoting *Eller v. Wendy's Internatl., Inc*., 142 Ohio App.3d 321, 340, 755 N.E.2d 906 (2000)." *Id.* at ¶ 21. "[T]he appearance of bias or prejudice must be compelling to overcome these presumptions." *In re Disqualification of George*, 100 Ohio St.3d 1241, 2003-Ohio-5489, 798 N.E.2d 23, ¶ 5.

**{¶63}** With respect to the trial court's statements at the sentencing hearing, we find no evidence to overcome the court's presumption of integrity. Although the trial court vocalized its displeasure with Thomas's failure to accept responsibility or show remorse for his actions, we cannot say Thomas's sentence was the product of "ill will," particularly where whether "[t]he offender shows no genuine remorse for the offense" is a

relevant recidivism factor to be considered under R.C. 2929.12(D)(5). Accordingly, we find no merit to Thomas's claim of judicial bias.

**{¶64}** Moreover, we are not able to conclude that Thomas's sentence was excessive. In this case, the trial court carefully considered the purposes of and principles of felony sentencing and imposed individual prison terms for each rape conviction that complied with the mandatory sentencing provisions of R.C. 2971.03(B)(1)(c).[2] The fact that the trial court ran two of Thomas's mandatory sentences consecutive to one another does not render his sentence excessive. *See State v. Hairston*, 118 Ohio St.3d 289, 2008-Ohio-2338, 888 N.E.2d 1073.

**{¶65}** Nevertheless, we find the trial court failed to make the necessary findings for imposing consecutive sentences pursuant to R.C. 2929.14(C)(4). Under R.C. 2929.14(C)(4), the sentencing judge must make the following findings before imposing consecutive sentences (1) that consecutive sentences are necessary to protect the public from future crime or to punish the offender, (2) that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and (3) that (a) the offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code,

---

[2] R.C. 2971.03(B)(1)(c) requires a trial court to impose "a minimum term of twenty-five years and a maximum of life imprisonment" upon an offender who commits a violation of R.C. 2907.02(A)(1)(b), and does so by purposely compelling his or her victim to submit by force or threat of force.

or was under postrelease control for a prior offense, (b) at least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct, or the offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶66} "[A] word-for-word recitation of the language of the statute is not required, and as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 29. The failure to make the findings, however, is "contrary to law." *Id*. at ¶ 37.

{¶67} In this case, the trial court discussed Thomas's extensive criminal history and briefly referenced H.W.'s physical and psychological vulnerability due to her age and incurable neurological disorder. However, the only remaining statements the court made when imposing the consecutive term was that Thomas's behavior and lack of remorse at the sentencing hearing, "convinced [the court] to impose a consecutive period of incarceration." While Thomas's reluctance to accept responsibility for his conduct is certainly a relevant factor in imposing a felony sentence, the court's failure to make the first and second findings under R.C. 2929.14(C)(4) rendered the sentence contrary to law.

**{¶68}** Accordingly, we sustain Thomas's fourth assignment of error.

### III.    Conclusion

**{¶69}** Based on the foregoing, we affirm Thomas's convictions but vacate his sentence and remand to the trial court for the limited purpose of considering whether consecutive sentences are appropriate, and, if so, to make the findings required by R.C. 2929.14(C)(4) on the record and to incorporate those findings into the sentencing entries.

**{¶70}** Judgment affirmed in part, reversed in part, and cause remanded to the lower court for proceedings consistent with this opinion.

It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


EILEEN T. GALLAGHER, JUDGE

LARRY A. JONES, SR., P.J., and
PATRICIA ANN BLACKMON, J., CONCUR