[Cite as *In re A.H.*, 2019-Ohio-4063.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE A.H., ET AL. | : | |
| | : | No. 108107 |
| Minor Children | : | |
| | : | |
| [Appeal by R.H., Mother] | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART; REVERSED
IN PART; REMANDED
**RELEASED AND JOURNALIZED:** October 3, 2019

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD-15910475, AD-15910476, AD-15910477

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee.*

Mark A. Stanton, Cuyahoga County Public Defender, and
Britta M. Barthol, Assistant Public Defender, *for
appellant.*

EILEEN A. GALLAGHER, J.:

{¶ 1} Appellant-mother, R.H. ("Mother"), appeals from the decision of the
Juvenile Division of the Cuyahoga County Court of Common Pleas (the "juvenile
court") terminating her parental rights and granting permanent custody of her three

minor children, A.H., Jo.H. and D.H.-B., to appellee, the Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the agency").[1]  For the reasons that follow, we affirm the juvenile court's decision as to A.H., reverse the juvenile court's decision as to Jo.H. and D.H.-B. and remand Cuyahoga C.P. Nos. AD-15910476 and AD-15910477, the cases involving Jo.H. and D.H.-B. for further proceedings.

**Factual Background and Procedural History**

**Adjudication and Temporary Custody to CCDCFS**

{¶ 2} On July 27, 2015, CCDCFS was granted emergency custody of Mother's daughter, A.H. (born on August 11, 2002), in connection with a delinquency action. On July 30, 2015, CCDCFS filed a complaint for neglect, requesting temporary custody of A.H. and protective supervision of Mother's three other children — a son, Ja.H. (born on November 5, 1998),[2] a daughter, Jo.H. (born on October 22, 2004) and a son, D.H.-B. (born on April 25, 2014).  The complaint alleged that Mother had a substance abuse problem that interfered with her ability to provide for the children, that she had failed to ensure that Ja.H., A.H. and Jo.H. consistently attended school, that she had left Jo.H. and D.H.-B. with inappropriate caregivers and that she had

---

[1] Although the juvenile court granted permanent custody of A.H., Jo.H. and D.H.-B. to CCDCFS and although Mother filed a notice of appeal in all three cases, on appeal, Mother has challenged only the juvenile court's decision to grant permanent custody of Jo.H. and D.H.-B. to CCDCFS.  In her appellate brief, Mother states that she "believes it is in the best interest of A.H., who is sixteen, to remain in her current placement."

[2] Ja.H. is not involved in this appeal.  The juvenile court granted the agency's motion to dismiss the complaint as to Ja.H. in March 2016, after he turned 18.

pending criminal charges against her for theft and forgery.[3]  On August 3, 2015, a guardian ad litem was appointed for the children.

{¶ 3} A month later, the agency filed a motion for predispositional temporary custody of Jo.H. and D.H.-B., alleging that Mother had been arrested on theft and forgery charges, that the home in which the children were residing was in a "deplorable and dilapidated condition" and that Mother had left the children alone, without any supervision, in "a dangerous and hazardous environment."  On September 4, 2015, the juvenile court granted CCDCFS emergency custody of Jo.H. and D.H.-B.  On November 2, 2015, CCDCFS filed an amended complaint for neglect and for temporary custody of all four children.[4]

{¶ 4} CCDCFS filed a case plan that required Mother to (1) obtain and maintain appropriate housing, (2) attend parenting classes addressing parent-teen conflict, (3) complete a drug and alcohol assessment and follow any recommendations regarding treatment, (4) submit to random drug screens and (5) engage in family counseling. The permanency goal was reunification of the children with Mother.

---

[3] With respect to the children's fathers, the complaint alleged that J.B., the father of Ja.H. and Jo.H., had failed to ensure that the children consistently attended school and that the alleged father of A.H., W.W., and the alleged father of D.H.-B., D.B., had failed to establish paternity and had failed to consistently support, visit or communicate with their children.

[4] In the amended complaint, the agency added allegations relating to the circumstances that led to the removal of Jo.H. and D.H.-B. from Mother's care in September 2015 and removed the allegation contained in the original complaint that Mother had a substance abuse problem that interfered with her ability to provide for the children.

**{¶ 5}** In March 2016, Mother admitted the allegations of a further amended complaint[5] and the juvenile court adjudicated A.H., Jo.H. and D.H.-B. to be neglected.

**{¶ 6}** At the disposition hearing on March 30, 2016, the magistrate inquired regarding the status of Mother's compliance with the case plan. The CCDCFS social worker assigned to the cases advised that Mother was engaged in a substance abuse treatment program, that Mother was submitting to random urine screens through the probation department, that Mother had secured housing and that referrals would be made for parenting classes and family counseling. The social worker further indicated that Mother was having weekly visits with the children at the home of the foster mother of Jo.H. and D.H.-B. ("Foster Mother"). The magistrate explained to Mother what was required of her in order to be reunified with her children and ensured that Mother understood what she needed to do:

---

[5] As it related to Mother, the further amended complaint alleged:

1. On July 27, 2015, A.H. was committed to the pre-dispositional custody of CCDCFS. Case No. DL15105963. Mother failed to appear for the court hearing and is unwilling to allow the child to return to the home.
2. Mother has had issues with stable housing.
3. Mother has failed to ensure that Ja.H. consistently attends school. Mother has also failed to ensure that her children A.H. and Jo.H. attend school on a consistent basis. Both children were absent approximately thirty days of school during the 2014-2015 school year. * * *
5. On September 3, 2015, two of the children were left unsupervised by mother in an abandoned home. The home in which the children were found was in a deplorable and dilapidated condition. There was garbage throughout the interior of the home which caused a foul odor and there were partially destroyed walls within the home. * * *

Reasonable efforts were made by the Cuyahoga County Division of Children and Family Services to prevent the removal of the removal of the children from the home, and removal is in the best interest of the children.

[THE COURT:] So, mom, what they're saying is basically they want you to complete your substance abuse, which is a requirement of I'm sure your probation, which you've started. You have to be clean and sober to take care of your kids. That's just, you know, the bottom line to meet their needs. Make sure that they go to school and that they're well taken care of.

You've made a step in the right direction by getting your housing. So that's good news for you and with the assistance of your lawyer, you know, some of those things by getting involved in family preservation and family services, that may even reduce any length of time that they'll be out of your care because of parenting classes. So that's good news for you.

And the most important thing is you're now visiting your children weekly * * * so that you're staying involved with their lives. So that's all good for you. You understand what the services are the Agency is asking you to complete?

[MOTHER]: Yes.

THE COURT: Do you have any questions right now?

[MOTHER]: No.

* * *

THE COURT: * * * So you're the leader, you're the quarterback at this point. So as fast as you work your case plan and remedy all those issues between yourself and your kids so that we can return them, that's how fast we will reunify with you. Do you understand?

[MOTHER]: Yes.

{¶ 7} With Mother's agreement, the juvenile court committed A.H., Jo.H. and D.H.-B. to the temporary custody of CCDCFS in May 2016.

{¶ 8} On June 23, 2016, CCDCFS filed a motion to modify temporary custody to permanent custody as to all three children. The agency alleged that Mother had not been consistent with her substance abuse treatment and had beaten her

boyfriend's child with an extension cord while she was the sole caregiver of the child in May 2016.

{¶ 9} At a hearing held on August 29, 2016, the CCDCFS social worker assigned to the cases reported that Mother had obtained housing, that she had completed substance abuse treatment in June 2016 and that she had been referred for family therapy. After reading the motion for permanent custody aloud and confirming that Mother understood the allegations set forth in the motion, the magistrate addressed Mother and ensured that she understood what was required of her:

> THE COURT: * * * Obviously, it sounds like a bad stretch for you back in 2015, but you're now engaged in services to address your needs as well as the needs of your children. Do you understand that?
>
> [MOTHER]: Yes.
>
> THE COURT: * * * And if there's not engaging, you know, that's why the Agency filed this motion. So please stay engaged. All right. Even if you have an issue and you're having a problem, stay engaged * * *. Because what we don't want to do is lose the momentum that we have going.
>
> It's really important because you obviously love and want to be involved in your children's life. Do you agree? Do you have any questions I haven't answered of you today?
>
> [MOTHER]: No.

{¶ 10} On September 13, 2016, CCDCFS withdrew its motion to modify temporary custody to permanent custody and filed a motion for an extension of temporary custody. In its motion, the agency indicated that Mother had completed substance abuse treatment and had stable housing but still needed to submit to random drug screens and engage in family counseling. The agency asserted that

although progress had been made on the case plan, because all of the case plan objectives had not been completed, the risk to the children had not been sufficiently reduced for reunification with Mother.

{¶ 11} In October 2016, Mother stipulated to the extension of temporary custody and the juvenile court extended temporary custody to January 30, 2017.

{¶ 12} On December 29, 2016, CCDCFS filed another motion to modify temporary custody to permanent custody. The agency alleged that although Mother had completed an intensive outpatient program in June 2016, she had failed to continue with the aftercare that had been recommended and had failed to submit to random drug screens to verify her sobriety. The agency further alleged that, since October 2016, Mother had failed to visit regularly with the children, that Mother lacked stable housing in which to provide for the children, that Mother had failed to engage in family preservation services designed to address the conflict between Mother and A.H. and that Mother had been charged with child endangering in connection with the May 2016 incident involving her boyfriend's child. The agency asserted that the children could not be placed with their parents within a reasonable time or should not be placed with their parents and that granting permanent custody to the agency was in the children's best interests.

{¶ 13} In the winter of 2017, the juvenile court appointed a new guardian ad litem for the children[6] and counsel for the children. At a pretrial hearing on February

___

[6] The record reflects that the children's prior guardian ad litem withdrew after she became a magistrate.

22, 2017, the CCDCFS social worker assigned to the cases reported that Mother had been evicted in November 2016 and was reportedly living with relatives. The social worker indicated that the current case plan for Mother was "substance abuse treatment, housing, basic needs, [and] parenting, specifically parenting conflicts." She stated that Mother had been referred for parenting education and family counseling to address the conflicts between Mother and A.H., but that Mother had been "evasive" and the case was closed "due to non-engagement." The social worker indicated that Mother successfully completed an intensive outpatient substance abuse program in June 2016, but failed to complete the aftercare program, and, since that time, had refused to comply with random drug screens requested by the agency. The social worker reported Jo.H. and D.H.-B. were living with Foster Mother, A.H.'s godmother, who had been "lifelong friends" with Mother but that A.H. had been moved to a group home in January 2017 "due to her violent and out of control behaviors." The social worker claimed that Mother had not seen her children since October 2016 and that A.H. did not want to have any contact with Mother.

{¶ 14} Mother's counsel indicated that Mother had recently signed a new lease and had been submitting to monthly drug screens in connection with her probation on a fraud conviction for cashing a bad check. In response to inquiries by the juvenile court judge, Mother stated that she was working two jobs as a bartender/banquet server. Mother further stated that she had violated the terms of her probation by testing positive for marijuana and that, as a result, the trial judge had added two years to her probation, which now totaled five years. Mother disputed the social worker's

claim that she had not been visiting her children and stated that she had been seeing Jo.H. and D.H.-B. on a weekly basis, either at Foster Mother's home or her own home, supervised by Foster Mother.

{¶ 15} With respect to the substance abuse treatment component of Mother's case plan, the juvenile court judge inquired:

> THE COURT: So what is it that you want as far as her substance? You want regular drug screens, correct? I want her to sign — if you're on probation and you know Judge Sutula doesn't play, get her probation officer and get the drug screens from them. I'm not going to make you do, you know, double drug screens.
>
> [MOTHER]: Thank you.
>
> THE COURT: But if he's only doing her once every month, I want you guys to fill a couple in there.
>
> [COUNSEL FOR THE AGENCY]: We would like to especially for the issues of alcohol.
>
> THE COURT: Mm-hmm. Listen, alcohol is not illegal. My problem with alcohol is if you cannot parent your children, if it interferes with parenting your children that's when it becomes an issue. Okay.

{¶ 16} With respect to Mother's visitation with the children, the juvenile court instructed the agency to "check with the [g]odmother and make sure that mom's visits are going well, that there's no issues and how often she is seeing them and then we can report that."

{¶ 17} The juvenile court judge also encouraged Mother to continue with her case plan services:

> THE COURT: Okay. The more you work, the happier I am. The last thing anyone in this Courtroom wants is to terminate your parental

rights because that doesn't do your children any good. But make sure that you understand you need to choose alcohol, marijuana or your children. Supporting your children.

* * *

You have a 13-year-old, a 12-year-old right now and you have a baby. Okay. If you don't want foster families or other people raising your children get it together. This is your last chance. I'm your last stop and I will give you all the leeway in the world, but if you don't do it, I will do what's in the best interest of your children.

**{¶ 18}** The juvenile court found that the agency had made reasonable efforts to prevent the continued removal of the children from the home and that it was not in the children's best interest to be returned to Mother at this time.

**{¶ 19}** On April 27, 2017, the juvenile court conducted another hearing. The agency advised the court that Mother had just started parenting classes and had housing and was employed, but had missed two appointments for a drug and alcohol assessment and had not cooperated with the agency's requests for random drug screens. In its April 29, 2017 journal entry, the juvenile court ordered Mother to comply with the agency's request for random urine screens. The juvenile court further indicated that the attorney for the children and the new guardian ad litem for the children had not yet been able to see or speak with the children "due to just recently being appointed to the case."

**{¶ 20}** A further hearing was scheduled for June 13, 2017. The guardian ad litem was unable to attend. The agency advised the court that "the parents are not progressing in Case Plan services." Accordingly, the juvenile court set the cases for trial in August 2017. The trial date was thereafter continued several times.

**{¶ 21}** On December 5, 2017, the juvenile court held another pretrial hearing. Mother's counsel reported that Mother was not present because she had not received notice that the time of the hearing had been moved up. The CCDCFS social worker assigned to the cases advised the court that the agency did not expect Mother to complete her case plan and have her children returned to her. The social worker indicated that Mother still needed to complete an anger management program, substance abuse treatment, parenting classes and "some type of family preservation, counseling" with A.H. The social worker claimed that Mother "ha[d] not done any of her case plan since 2015." Mother's counsel disputed that claim. The juvenile court found that the agency had made reasonable efforts to prevent the continued removal of the children from the home and that it was not in the children's best interest to be returned to Mother at this time. At the hearing, the juvenile court stated that the permanency plan was reunification with a concurrent plan of permanent custody and adoption. In its December 12, 2017 journal entries reporting on the hearing, the juvenile court stated that the permanency plan was adoption. Trial was scheduled for March 2018. Once again, there were numerous continuances of the trial date.

**{¶ 22}** On January 23, 2018, the juvenile court judge conducted an in camera interview of A.H. and Jo.H. A.H. advised the juvenile court judge that she wanted to be placed in the permanent custody of the agency and did not want to be reunited with Mother. Jo.H. indicated that she did not know whether she wanted to return to Mother.

{¶ 23} On February 22, 2018, the children's guardian ad litem submitted her written report in which she recommended that the agency be granted permanent custody of all three children. She reported that A.H., who had a history of behavioral and delinquency issues, was living in a residential facility and that the other two children were in a foster placement with Foster Mother, a close family friend who had been known to them as an "auntie" for many years. The guardian ad litem indicated that she had interviewed the children in their placements, the staff at the group home, the social worker and Foster Mother. She reported that A.H. and Jo.H. had expressed that they did not want to return to Mother's care and that A.H., who disliked living in the group home and did not believe she was benefiting from it, was hopeful that her "mentor" could become a licensed foster caregiver and a placement for her.

{¶ 24} The guardian ad litem reported that the girls "describe ongoing inconsistency with their mother, concerns about her drinking or otherwise being under the influence, and having boyfriends in the picture who are not good guys." She reported that Jo.H. and D.H.-B. were doing well in school, have "a very active extracurricular life" and "seem to be exposed to a different kind of life than their Mother lea[ds]," living in a "nice house," going to school, having friends, being "very busy" and "generally seeing there is a different way to live." The guardian ad litem reported that she had not yet visited Mother or seen her interacting with the children. She indicated that she had attempted to schedule a home visit and to observe visitation with Mother but that "Mother either says she doesn't know her work schedule or cancels." The guardian ad litem indicated that she had also asked Foster

Mother to inform her when visitation was scheduled, but that Foster Mother had not done so.

{¶ 25} On May 29, 2018, two weeks before the scheduled trial date, Mother's counsel withdrew, resulting in a further continuance of the trial date. New counsel was appointed for Mother, the June 14, 2018 trial was converted to a pretrial hearing and a new trial date was scheduled. At the June 14, 2018 pretrial hearing, the CCDCFS social worker assigned to the cases reported that Mother's case plan required completion of parenting and anger management programs, substance abuse treatment and to obtain housing. The social worker reported that Mother had completed parenting classes and had obtained and maintained housing, but that the agency had concerns about whether an adult son, against whom sexual abuse allegations had been made when he was 10, was living with her. Mother denied that her son was living with her.

{¶ 26} With respect to the substance abuse component of Mother's case plan, the social worker stated that Mother had reported that she had completed treatment but that "when she was doing treatment[,] there were not positive reports that she was benefitting from services." She indicated that the agency had requested that Mother complete another alcohol and drug assessment, which Mother completed, but that Mother had refused to submit to regular drug screens or follow up with treatment. The social worker stated that the last time Mother had submitted to a random drug screen was in January 2018 and that the results were negative. The social worker also

stated that Mother had "refuse[d] to comply" with the anger management component of her case plan.

{¶ 27} Mother claimed that she had not seen or spoken with the social worker "in months" and that the guardian ad litem likewise had not been in contact with her. Mother claimed that she worked "a lot of hours," that she had called and left messages for the social worker but had received no response and that the social worker had cancelled scheduled meetings with her. The social worker disputed these claims and said that the last time she spoke with Mother, Mother said she was "too busy" to meet with the social worker. The social worker stated that she had been to Mother's house and had "left letters" and "made attempts" to get in contact with Mother.

{¶ 28} The guardian ad litem likewise refuted Mother's claims and stated that Mother "won't make herself available for me." With respect to visiting the children, the guardian ad litem reported that she had last seen the children "[r]ight before the last hearing." She indicated that she had attempted to schedule visits with the children since that time but that Foster Mother would not cooperate.

{¶ 29} Mother stated that she did not want her parental rights terminated and acknowledged that she had been "kind of rebellious at first * * * [a]gainst what they were asking me to do." She stated that she believed she was "doing the majority of what they're asking me to do" but that "[t]hey keep like adding onto my case plan. As soon as I complete something, they adding some more."

{¶ 30} Mother reported that she was visiting Jo.H. and D.H.-B. twice a week under the supervision of Foster Mother and that the days and times of her visitation

varied based on her work schedule. Mother stated that she did not attend the anger management program to which the agency had referred her because the parenting classes she attended included anger management. She stated that in the parenting classes she was "taught how to deal with anger, how to deal with the children reconnecting with them and bringing us back together" and that she believed "this particular program actually really helped me out a lot." The social worker indicated that she had not been able to speak with Mother's service providers because the releases Mother had previously signed had expired. Mother signed updated releases and the court directed the social worker to contact the service provider of the parenting classes to determine the extent to which they included anger management. The juvenile court advised Mother that "if it did to the point where we're satisfied, we will knock that off and you will have completed it." The court also ordered that Mother be referred to the Diagnostic Clinic for a custody evaluation and that Mother "immediately" submit to a random drug screen and continue with random screens. The juvenile court advised Mother:

> So, mom, listen, the ball is in your Court. Either step up to the plate and engage or don't, you know, all I know is your children are going to need permanency one way or the other. I will give you every opportunity and the fact that [prior counsel] has withdrawn has given you probably an extra two to three months and you've got an amazing attorney. And so you're going to have a chance to step up and do what you do.

{¶ 31} Counsel for the agency stated that Mother and A.H. had been referred for family counseling but that A.H. had not been compliant. A.H., who was present at the hearing, advised the juvenile court that she would participate in counseling but

that she "did not want to go live back home" and that she wanted the court to award permanent custody of her to CCDCFS. Mother and the social worker disputed whether Foster Mother was willing to adopt Jo.H. and D.H.-B. if permanent custody of the children was granted to the agency.

{¶ 32} With respect to the children's fathers, the social worker reported that paternity had not been established for A.H. and D.H.-B. and that J.B., father of Jo.H., had advised that he did want to be involved with the court or Jo.H.

{¶ 33} On June 27, 2018, the guardian ad litem filed a motion to change placement, alleging that Foster Mother had become "continuously evasive and hostile" and was refusing to allow her to conduct a home visit with the children at their foster placement. The guardian ad litem stated that, based on her unsuccessful attempts to visit the children, she was "very concerned about the children's ability to communicate freely, and without interference with their GAL" and that "[t]here is also conflict between the foster caregiver and the mother, that seems to be impacting the mother's visitation and may also be negatively impacting the relationship between the children and their mother." The juvenile court later granted the guardian ad litem's motion to withdraw this motion.

### The Permanent Custody Hearing

### Testimony by the CCDCFS Social Workers

{¶ 34} In October 2018, the juvenile court held a hearing on the agency's motion to modify temporary custody of the children to permanent custody. Three witnesses testified on behalf of CCDCFS — Amber May and Kristy Van Divner, two of

the CCDCFS social workers who handled the children's cases, and Randall Baenen, Ph.D., a psychologist who conducted a psychological interview of Mother after the juvenile court referred Mother to the Diagnostic Clinic for a custody evaluation.

{¶ 35} May was the CCDCFS social worker assigned to the children's cases from December 2015 through June 2016 and from February 2017 through the permanent custody hearing. Van Divner was the social worker assigned to the cases from August 2016 through January or February 2017, when May was out on leave.

{¶ 36} May testified that when she was first assigned to the cases in December 2015, a case plan was in place that required Mother to secure appropriate housing, complete an alcohol and drug assessment and comply with any recommended treatment, submit to random drug screens and complete a parenting program, specifically, a program that addressed parenting conflict. The permanency plan was reunification with Mother.

{¶ 37} Van Divner testified that when she took over the case in August 2016, a motion to modify temporary custody to permanent custody was pending. She stated that because Mother (1) was making progress on the case plan — i.e., at that time, Mother was employed, had suitable housing and had provided a certificate indicating that she had completed an intensive outpatient program — and (2) had expressed a desire to be reunited with her children and a willingness to engage in case plan services, the agency decided to withdraw the motion for permanent custody.

{¶ 38} Van Divner testified that she later learned, when talking with the service provider, that although Mother had provided a certificate indicating that she had

"successfully completed" substance abuse treatment at Catholic Charities, Mother did not complete the aftercare that had been recommended. Van Divner further testified that despite her requests "maybe approximately five [or] ten" times that Mother submit to random drug screens, Mother failed to do so and told Van Divner that she was submitting to drug screens in connection with her probation. Van Divner stated that she attempted to follow up with Mother's probation officer to confirm this but that she was unable to do so during the time she handled the cases.

{¶ 39} Van Divner testified that Mother also failed to engage in family preservation services designed to address her parenting conflict with A.H. Van Divner testified that, during this time, Mother lost her housing and the assigned worker was "unable to complete the visits," so she "close[d] the case due to non-engagement."

{¶ 40} With respect to visitation, Van Divner testified that Mother was "inconsistent" and was "not regularly visiting with the children" during the time she handled the cases. Van Divner stated that when she was first assigned to the cases, there was a "loose visitation" arrangement between Mother and Foster Mother, i.e., because they had a "good relationship," Mother and Foster Mother set up their own informal visitation schedule. Van Diver stated that in October 2016, however, a dispute arose between Mother and Foster Mother, and Foster Mother informed Mother that she would need to set up future visitation through the agency. Van Divner testified that she did not have "any documentation for visits from like October through December [2016]" and that, to her knowledge, Mother had not re-engaged with visitation by the time May resumed handling the cases in early 2017. However, Van

Divner acknowledged that if Mother had independently set up visitation with Foster Mother, she would not have been aware of that visitation.

{¶ 41} May testified that, as of the time of the permanent custody hearing, housing was no longer an issue. Mother was employed full time and had obtained and maintained appropriate housing. May further testified that Mother had completed parenting classes and was reported to have benefited from them.

{¶ 42} With respect to the substance abuse component of Mother's case plan, May testified that Mother was initially referred to Catholic Charities for an alcohol and drug assessment. She indicated that, following the assessment, completion of an intensive outpatient program and aftercare was recommended. May testified that she was "not 100% sure" that Mother "completed treatment there" because, although Mother received a certificate of completion, "[t]here seemed like discrepancies as to whether she actually completed the treatment because when the collateral contacts were made[,] * * * they reported that she was attending, but that she was not consistently attending or benefitting" and that Mother did not complete aftercare. May testified that the agency made a new referral to New Visions, where Mother, once again, completed an alcohol and drug assessment, but that Mother "refused to comply with treatment at that time."[7]

{¶ 43} May testified that Mother also failed to regularly submit to random drug screens requested by the agency. May indicated that Mother told her that she did not

---

[7] It is unclear from the record when this new referral was made or what treatment was recommended as a result of this referral.

believe she should be required to submit to the agency's drug screens because she was already "proving her sobriety" by submitting to drug screens as part of her probation. May testified that she spoke with Mother's probation officers "several times" and explained to Mother that the drug screens with which she complied as part of her probation were insufficient because they occurred when she had a scheduled meeting with her probation officer, rather than on a random basis. May indicated that Mother had once tested positive for marijuana in a probation drug screen in December 2016, but had never tested positive on any drug screens for the agency. May testified that Mother had last submitted to a random drug screen for the agency in January 2018. She indicated that Mother failed to comply with the agency's requests for random urine screens in March, May and July 2018 or its request for a hair sample in August 2018.

{¶ 44} During her testimony, the juvenile court asked May how Mother's marijuana use "interfere[ed] with her ability to parent." May responded that, initially, Mother "did not have stable housing and had [a] lack of supervision for her children * * * so there was some concern that maybe at that time it was interfering." May stated that, as of the time of the permanent custody hearing, May had no specific information that Mother's marijuana use "impact[ed] her parenting." She indicated that it could be the cause of "her lack of consistency, but it's not necessarily preventing her from parenting her children."

{¶ 45} May testified that an anger management component was added to Mother's case plan in July 2017, after Mother pled guilty to a child endangering charge

associated with Mother's discipline of her boyfriend's daughter in 2016. May stated that Mother had admitted to "whoop[ing]" her boyfriend's daughter with a belt because "she was trying to show her that she should not steal." May stated that there had been no other incidents of concern regarding Mother's anger management since 2016, but noted that no children had been living with her.

{¶ 46} May testified that Mother refused to attend the anger management program to which she had been referred because Mother felt she had satisfied the anger management requirement of her case plan by completing parenting classes that included anger management. May testified that after the court hearing in June 2018, she contacted the service provider for the parenting classes Mother had completed to inquire about the issue. May stated that she was told that the parenting classes addressed "some anger management" but that the provider also offered a separate anger management program. May stated that she did not further inquire as to what was included in the "some anger management" component of the parenting classes Mother had completed. May indicated that because the service provider offered a separate anger management program, whatever anger management education was included in the parenting classes would not satisfy the anger management requirement of Mother's case plan. May testified that she advised Mother of this, but that Mother refused to attend the anger management program.

{¶ 47} With respect to the children's placements at the time of the permanent custody hearing, May stated that A.H., who was then 16, was placed with her "mentor," who had expressed a willingness to adopt her. She stated that Jo.H., who

was then nearly 14, and D.H.-B., who was then nearly four-and-one-half, were still living with Foster Mother, with whom the children had been placed, at Mother's request, at the outset of the cases. May indicated that the children were "very, very bonded" with Foster Mother and that Foster Mother "does a very good job with them." She stated that Foster Mother had indicated a willingness to adopt Jo.H. and D.H.-B. if reunification is not possible. May indicated that the two younger siblings are "very bonded" and "love each other" and that both children had expressed to her sometime after February 2017 that they wished to remain with Foster Mother. May stated that no other relatives had been identified for potential placement of any of the children.

{¶ 48} With respect to Mother's relationship with Jo.H. and D.H.-B., May testified that Mother has "a very close relationship" with her children. May stated that, at first, there was a "very loose" visitation arrangement between Mother and Foster Mother. She indicated that visitation stopped for "a short amount of time" due to a dispute between Mother and Foster Mother and that, during that time, the agency arranged for supported weekly visits with Mother. May stated that Mother attended every visit. May testified that visitation was "back to being loose," i.e., weekly visitation arranged between Mother and Foster Mother. May stated that, to her knowledge, there had been no overnight visitation with Mother.

{¶ 49} May testified that there had never been any reported issues with Mother's parenting and that she had personally observed Mother's parenting time with Jo.H. and D.H.-B. and that it was appropriate. In response to an inquiry by the juvenile court judge as to what May "would * * * want to see out of the mother in order

not to request permanent custody," May stated: "For her to complete her anger management and to provide a hair sample" in order to "comply with the case plan" and "ensure that she is sober."

{¶ 50} With respect to the children's fathers, Van Divner testified that she had no contact with any of the children's fathers or alleged fathers during the time she handled the case. She stated that it was her understanding that J.B., Jo.H.'s father, "was occasionally having a relationship with [Jo.H.]" but that he did not want to be reunified with her and did not want to participate in any services. May testified that she met with J.B. once and that he "expressed at that time that he loves [Jo.H.] but that he doesn't want to have any participation in the Agency and what we're doing." The alleged fathers of A.H. and D.H.-B. never established paternity and had no involvement with the agency.

### Testimony by Dr. Baenen

{¶ 51} Dr. Baenen testified that he met with Mother once in August 2018. He testified that his evaluation of Mother consisted of an interview he conducted of Mother, his review of psychological tests his staff performed on Mother and his review of documentation provided to him by CCDCFS. Dr. Baenen testified that, based on his evaluation, he believed Mother was "lacking" in [the] qualities" necessary to make "meaningful personal change" and accomplish the objectives of her case plan. He stated that Mother "minimize[ed]" her "drug and alcohol issues" and disputed that she had an issue with anger. He indicated that Mother informed him that she had not complied with the anger management component of her case plan because she felt

her case plan had "unfairly grown since the initial involvement" and that "her parenting class addressed many issues related to anger and discipline." He further noted that although Mother had completed a drug and alcohol assessment, she had indicated that she was not inclined to participate in intensive outpatient programming because "[s]he felt her sobriety was demonstrated through the regular drug tests she was receiving through the Court system."

{¶ 52} According to Dr. Baenen, however, what he found most "striking," was Mother's "attitude," i.e., her refusal to simply comply with the services that had been requested of her so that she could be potentially reunified with her children, regardless of whether it she felt it was "unfair." As he explained:

> I heard what she had to say, but what's striking to me is that she had made her objections clear, but had not decided to comply simply to be in compliance with the case plan and take whatever benefit she could from an anger management program given the delays evident in this case.
>
> * * *
>
> And she disputes that anger is an issue in her life, which is the basis for her objecting to the case plan. What was striking to me is simply not being practical in taking these services to try to learn from them and simply to get this as an issue that is not holding up her case plan and reuniting with her children.
>
> So there's different disputes that she has with the Department about the issues of anger in her life, although I certainly see indications that anger has been a problem. But more importantly, I do not understand the lack of effective problem solving to simply deal with this as an issue that's required to get her children back.
>
> * * *

> [P]ast behavior is the best predictor of future behavior and so far there has been a resistance on this issue.
>
> In addition, meaningful personal change is predicated on acknowledging personal issues and the need to take responsibility for them. And mature decision-making is predicated on the awareness of what are the situational demands, what are my options and what serves my best interest. * * * I feel she is lacking in those qualities.

{¶ 53} At the permanent custody hearing, the juvenile court also heard from the guardian ad litem regarding her report[8] and recommendation that permanent custody of all three children be granted to the agency. The guardian ad litem stated that D.H.-B. is "really too young to even grasp what this process is or to express his wishes" but that he is "happy where he is." She indicated that A.H. and Jo.H. had both been "really steadfast and really clear" that they wanted to be placed in permanent custody and did not want to be reunified with Mother. The guardian ad litem indicated that she had conducted a home visit of Mother's residence and that Mother home was "adequate" but that she had never observed Mother with any of the children. She indicated that she had attempted to attend visitation but that, due to communication difficulties with Mother and Foster Mother, she never succeeded in observing Mother interacting with any of the children.

{¶ 54} In response to the juvenile court's inquiry regarding whether she would have a different recommendation if the children wanted to be reunified with Mother,

---

[8] The guardian ad litem did not submit an updated written report following her submission of her report in February 2018.

the guardian ad litem stated that she would still recommend that permanent custody be granted to the agency.  She explained:

> THE WITNESS: It's been a really long time that this case hasn't resolved and I don't know how [we are] here[.]  We've been in this for a very, very really long time.  And I think Dr. Baenen also got at just the minimization of it.  If you haven't remedied the situation years into it, I don't know when you're going to at this point.
>
> THE COURT:  But she's completed her case plan objectives for the most part?
>
> THE WITNESS: For the most part, yeah, but it's been very hard to schedule with mom, to meet with mom.  I really wanted to observe her with the kids, that ended up not happening.

{¶ 55} The children's counsel stated that he believed his client's wishes were "consistent with the Guardian ad Litem's recommendation" and that the guardian ad litem's recommendation, along with the court's in camera interview of A.H. and Jo.H., was "enough evidence for the Court to make its own decision" regarding the agency's request for permanent custody.

{¶ 56} Mother did not testify and did not present any witnesses at the permanent custody hearing.

### The Juvenile Court's Decision to Grant Permanent Custody of the Children to CCDCFS

{¶ 57} Immediately following the presentation of evidence and the parties' arguments at the permanent custody hearing, the juvenile court announced that it was granting the agency's motion for permanent custody.  The court explained the reasoning behind its ruling as follows:

THE COURT: As far as [D.H.-B.] * * *, the child is too young to express any of his wishes, though it is clear that mom has abandoned the child for more than 90 days, which is only one of the factors. The other factors are — mom, I understand that you are using marijuana and it may or may not impede your ability to parent, but at this juncture the Court feels that it's in the best interest of [D.H.-B.] to be placed in the permanent custody of the Division of Children & Family Services.

As for [A.H.] and [Jo.H.], it's an interesting case. They're old enough to kind of care for themselves, but at the same time they have lived with you, they've lived your life, they know what it is, what life with you is like and they have both opted to stay where they are. * * *

Based on the fact that there was a 90-day lapse and the children were abandoned and the fact that both children have emphatically stated that they, through the Guardian ad Litem and through the attorney that they wish to stay where they are. Unfortunately, the Court has no option because that is what our legislature says. And they have been in the Division of Children & Family Services since 2015. * * *

So the Court finds under 2151 the child cannot be placed with the mother within a reasonable period. The child has been in the Cuyahoga County Division of Children & Family Services for two years and no longer qualifies for temporary custody. The children do not meet the requirements for Planned Permanent Living Arrangement and prior to dispo [sic] no relative or interested party has filed a motion for legal custody.

So, mom, on that point, the Court's hands are tied because the legislature has indicated that based on those factors I must grant permanent custody to the Agency and find that it is in their best interest. So I understand that you will still, you know, probably see your children, but as I said, it's probably one of the most difficult parts of my job, but I wish you well.

{¶ 58} On December 6, 2018, the juvenile court issued written journal entries granting CCDCFS' motion to modify temporary custody to permanent custody, terminating the parental rights of Mother and the children's fathers and awarding permanent custody of all three children to CCDCFS. The juvenile court found that

granting permanent custody to the agency was in the children's best interest because

"all of the factors" set forth in to R.C. 2151.414(D)(2) "apply." The juvenile court found

that there was clear and convincing evidence that that the children could not be placed

with one of the children's parents within a reasonable time or should not be placed

with either parent. The juvenile court further found that the agency had made

reasonable efforts to make it possible for the children to return home but that the

services provided were not successful because "[c]ase plan services had not been

completed."

{¶ 59} Mother appealed, raising the following three assignments of error for

review:

> Assignment of Error I:
> The trial court's decision to award permanent custody to CCDCFS was against the manifest weight of the evidence as it was not supported by clear and convincing evidence.
>
> Assignment of Error II:
> The trial court erred by failing to apply the best interest factors outlined in R.C. 2151.414(D)(1).
>
> Assignment of Error III:
> The appellant was denied due process of law when the trial court failed to provide her with a fair and impartial trial evidenced by the statements made during the in camera interview.

{¶ 60} For ease of discussion we address Mother's third assignment of error

first.

**Law and Analysis**

**Allegations of Judicial Bias**

{¶ 61} In her third assignment of error, Mother claims that she was denied a right to a fair and impartial trial because the juvenile court judge "made biased statements towards [Mother]" during her in camera interview of A.H. and Jo.H. Specifically, Mother contends that certain of the juvenile court judge's remarks and questions during the in camera interview were inappropriate and "meant to cast a poor image of the mother to her children," including the juvenile court judge's comparison of Mother's choices to those of Foster Mother and the juvenile court judge's comment that permanent custody "really wouldn't be any different" because Mother's "not really taking care of you anyway." Mother further contends that the juvenile court's statement during the in camera interview that Mother had not completed her case plan services, made before any evidence was presented at the hearing regarding the issue, demonstrated bias because "the court was not keeping an open mind regarding the facts to be presented at the hearing." We disagree. We find nothing in the record before us to suggest that the juvenile court's decision was based on bias or prejudice against Mother.

{¶ 62} As an initial matter, we note that the transcript of the juvenile court judge's in camera interview with A.H. and Jo.H. was not sealed and that Mother has quoted portions of the in camera interview, including specific statements by the children, in her appellate brief. We believe this is improper. Accordingly, we hereby

order, sua sponte, that the transcript from the January 23, 2018 in camera interview, and that Mother's appellate brief be placed under seal.

{¶ 63} The purpose of an in camera interview of children in custody proceedings is "to provide children with a forum for openly discussing their concerns and preferences regarding their own custody" outside the presence of the parties. *Jackson v. Herron*, 11th Dist. Lake No. 2003-L-145, 2005-Ohio-4046, ¶ 17; *see also In re Theaderman*, 12th Dist. Brown Nos. CA2001-04-003, CA2001-04-004, CA2001-08-012, CA2001-08-013, 2002 Ohio App. LEXIS 151, 16 (Jan. 18, 2002) ("An in-chambers interview provides a secure setting for a minor child to candidly express his or her feelings."); *In re I.T.*, 9th Dist. Summit No. 27826, 2016-Ohio-4668, ¶ 10 ("The purpose of an in camera interview of a child in a custody case is to determine the child's wishes and 'to protect the child from having to say negative things about either party or express a custodial or visitation preference in the presence of the parties.'"), quoting *In re Whitaker*, 36 Ohio St.3d 213, 218, 522 N.E.2d 563 (1988); *cf. Myers v. Myers*, 170 Ohio App.3d 436, 2007-Ohio-66, 867 N.E.2d 848 (5th Dist.), ¶ 50 (observing that the process of recording an in camera interview and sealing the transcript "allows appellate courts to review the in-camera interview proceedings and ascertain the reasonableness of same, while still allowing for the child to 'feel safe and comfortable in expressing his or her opinions honestly and openly, without subjecting the child to any additional psychological trauma or loyalty conflicts'"), quoting Barbara L. House, *Considering the Child's Preference in Determining Custody: Is It Really in the Child's Best Interest?*, 19 J.Juv.L. 176 186 (1998).

{¶ 64} In this case, the juvenile court judge had specifically advised the children (who were then 15 and 13) prior to the commencement of the interview, that "[f]irst and foremost this will be sealed and will not be — so no one, no one, not your mom, not anybody will hear what you say to me. Okay. Not your social worker. Not anyone."[9] It is unclear from the record what circumstances led to the disclosure of the transcript of the in camera interview to the parties in this case. *See, e.g., In re Theaderman* at 15-16 (In the context of a permanent custody case, "a trial court, in a dispositional hearing, has the discretion to determine whether the circumstances of a particular case warrant the disclosure of the transcripts of in camera interviews conducted for the purposes of ascertaining the best interest of a child adjudicated to be abused, neglected or dependent. The trial court should balance the potential harm disclosure presents to the child with the benefit of access.").

{¶ 65} Judicial bias has been described as "'a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his or her attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts.'" *State v. Dean*, 127 Ohio St.3d 140, 2010-Ohio-5070, 937 N.E.2d 97, ¶ 48, quoting *State ex rel. Pratt v. Weygandt*, 164 Ohio St. 463, 132 N.E.2d 191 (1956), paragraph four of the syllabus. Trial judges are presumed to be fair, impartial and unbiased. *See, e.g., In re Disqualification of George*, 100 Ohio St.3d 1241, 2003-

---

[9] The children's guardian ad litem and attorney were present during the in camera interview.

Ohio-5489, 798 N.E.2d 23, ¶ 5 ("A judge is presumed to follow the law and not to be biased, and the appearance of bias or prejudice must be compelling to overcome these presumptions."); *State v. Thomas*, 8th Dist. Cuyahoga No. 101797, 2015-Ohio-3226, ¶ 62 ("'A trial judge is "presumed not to be biased or prejudiced, and the party alleging bias or prejudice must set forth evidence to overcome the presumption of integrity."'"), quoting *Weiner v. Kwiat*, 2d Dist. Montgomery No. 19289, 2003-Ohio-3409, ¶ 90, quoting *Eller v. Wendy's Internatl., Inc.*, 142 Ohio App.3d 321, 340, 755 N.E.2d 906 (10th Dist.2000). If a trial judge informs an opinion based on facts introduced or events occurring during the course of the current or prior proceedings, this does not rise to the level of judicial bias, "'"unless [the opinions] display a deep-seated favoritism or antagonism that would make fair judgment impossible."'" *State v. Hough*, 2013-Ohio-1543, 990 N.E.2d 653, ¶ 11 (8th Dist.), quoting *Dean*, ¶ 49, quoting *Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994).[10]

---

[10] We note that generally, "[a] court of appeals has 'no authority to determine a claim that a trial judge is biased or prejudiced against a defendant and no authority to void a trial court's judgment based on a claim that the trial judge is biased or prejudiced.'" *State v. Frazier*, 2017-Ohio-8307, 98 N.E.3d 1291, ¶ 16 (8th Dist.), quoting *State v. Williamson*, 8th Dist. Cuyahoga No. 104294, 2016-Ohio-7053, ¶ 27; *see also In re K.B.*, 2d Dist. Montgomery No. 27982, 2018-Ohio-3600, ¶ 21. However, "[i]n the context of termination of parental rights, due process requires that the state's procedural safeguards ensure that the termination proceeding is fundamentally fair." *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 17, citing *Santosky v. Kramer*, 455 U.S. 745, 753-754, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). As this court stated in *State v. Rodriquez*, 8th Dist. Cuyahoga No. 107720, 2019-Ohio-3278, in the context of a criminal proceeding:

[P]roceedings before a biased judge are fundamentally unfair and denies a defendant due process of law. *State v. Dean*, 127 Ohio St.3d 140, 2010-Ohio-5070, 937 N.E.2d 97, ¶ 48. Thus, a trial court judgment may be reversed due

{¶ 66} There is nothing in the record to indicate that the juvenile court's decision was the product of bias or impartiality. The juvenile court judge had been presiding over this matter since its inception in 2015. She was well acquainted with the parties and their history. During the two-and-one-half years these cases had been pending prior to the in camera interview, the juvenile court judge had personally conducted numerous pretrial hearings where Mother's progress with case plan services and the status and needs of the children had been discussed. The juvenile court judge's remarks during the in camera interview, when viewed as a whole and in context, reflect an attempt by the juvenile court to engage the teenage children in an open and frank conversation regarding their feelings towards their Mother, their wishes with respect to being reunited with their Mother and their own goals and desires for the future — not an attempt to turn the children against Mother. The transcript reveals a juvenile court judge who was compassionate, who took steps to connect with the children and who took great care to ensure that the children were at ease in what was likely a very unfamiliar, uncomfortable setting. Although certain of the juvenile court judge's comments or questions during the in camera interview could have perhaps been more carefully or artfully worded, we cannot say that the juvenile court judge shirked her duty of impartiality, prejudged Mother or predetermined the result before considering all the evidence presented at the

to bias if the bias or prejudice violated the defendant's right to due process and deprived the defendant of a fair proceeding. *Id.*

*Rodriguez* at ¶ 15.

permanent custody hearing. To the contrary, the record reflects that, throughout the duration of this case, the juvenile court judge actively encouraged Mother to complete her case plan so that she could be reunited with her children.

{¶ 67} Mother's third assignment of error is overruled.

### The Juvenile Court's Decision to Grant Permanent Custody of Jo.H. and D.H.-B. to CCDCFS

{¶ 68} Mother's first and second assignments of error are interrelated. Accordingly, we address them together. In her first assignment of error Mother contends that the juvenile court's decision to award permanent custody of Jo.H. and D.H.-B. to CCDCFS was against the manifest weight of the evidence. Specifically, Mother argues that the juvenile court's decision should be vacated because (1) the juvenile court failed to find that one of the circumstances set forth in R.C. 2151.414(B)(1)(a)-(e) applied and (2) the juvenile court "incorrectly applied" the best interest test outlined in R.C. 2151.414(D)(2) because the record lacks clear and convincing evidence that one or more of the factors set forth in R.C. 2151.414(E) exist and the children cannot be placed with Mother within a reasonable time or should not be placed with Mother. In her second assignment of error, Mother argues that the juvenile court erred in failing to consider the factors set forth in R.C. 2151.414(D)(1) in determining whether permanent custody was in the children's best interest.

{¶ 69} The right to raise one's own child is "'an essential and basic civil right.'" *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 67, quoting *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997); *see also In re Murray*, 52 Ohio St.3d

155, 157, 556 N.E.2d 1169 (1990) (a parent has a "'fundamental liberty interest' in the care, custody, and management" of his or her child), quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). However, this right is not absolute. It is "'always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, 86 N.E.3d 1012, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

{¶ 70} Because termination of parental rights is "'the family law equivalent of the death penalty in a criminal case,'" *In re J.B.*, 8th Dist. Cuyahoga No. 98546, 2013-Ohio-1704, ¶ 66, quoting *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14, it is "an alternative of last resort," *In re Gill*, 8th Dist. Cuyahoga No. 79640, 2002-Ohio-3242, ¶ 21. It is, however, "sanctioned when necessary for the welfare of a child." *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, ¶ 7, citing *In re Wise*, 96 Ohio App.3d 619, 624, 645 N.E.2d 812 (9th Dist.1994). "'All children have the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation.'" *In re J.B.* at ¶ 66, quoting *In re Hitchcock*, 120 Ohio App.3d 88, 102, 696 N.E.2d 1090 (8th Dist.1996). Where parental rights are terminated, the goal is to create "a more stable life for the dependent children" and to "facilitate adoption to foster permanency for children." *In re N.B.* at ¶ 67, citing *In re Howard*, 5th Dist. Tuscarawas No. 85 A10-077, 1986 Ohio App. LEXIS 7860, 5 (Aug. 1, 1986).

## Standard for Terminating Parental Rights and Granting Permanent Custody to CCDCFS

{¶ 71} Before a juvenile court can terminate parental rights and grant permanent custody of a child to CCDCFS, it must satisfy the two-prong test set forth in R.C. 2151.414. First, the juvenile court must find by clear and convincing evidence that one of the following conditions set forth in R.C. 2151.414(B)(1)(a) through (e) exists:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been

adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

R.C. 2151.414(B)(1).

{¶ 72} Second, the juvenile court must find by clear and convincing evidence that granting permanent custody to the agency is in the best interest of the child. *Id.* "Clear and convincing evidence" is that "measure or degree of proof" that "produce[s] in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *In re M.S.*, 2015-Ohio-1028, at ¶ 8. "A juvenile court's decision to grant permanent custody will not be reversed as being against the manifest weight of the evidence 'if the record contains some competent, credible evidence from which the court could have found that the essential statutory elements for permanent custody had been established by clear and convincing evidence.'" *In re G.W.*, 8th Dist. Cuyahoga No. 107512, 2019-Ohio-1533, ¶ 62, quoting *In re A.P.*, 8th Dist. Cuyahoga No. 104130, 2016-Ohio-5849, ¶ 16.

{¶ 73} R.C. 2151.414(D)(1) states that in determining whether permanent custody is in a child's best interest, the court "shall consider all relevant factors," including, but not limited to, the following:

(a)     The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b)     The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in [R.C. 2151.414(E)(7) to (11)] apply in relation to the parents and child.

{¶ 74} No one factor is to be given greater weight than the others. *In re T.H.*, 8th Dist. Cuyahoga No. 100852, 2014-Ohio-2985, ¶ 23, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. Although the juvenile court is required to consider each factor listed in R.C. 2151.414(D)(1), only one of the factors set forth in R.C. 2151.414(D)(1) needs to be resolved in favor of permanent custody. *In re A.B.*, 8th Dist. Cuyahoga No. 99836, 2013-Ohio-3818, ¶ 17; *In re N.B.,* 2015-Ohio-314, at ¶ 53.

{¶ 75} In addition, R.C. 2151.414(D)(2) sets forth a list of circumstances, which, if satisfied, mandates a finding that permanent custody is in the best interest of the child. R.C. 2151.414(D)(2) states:

If all of the following apply, permanent custody is in the best interest of the child, and the court shall commit the child to the permanent custody of a public children services agency or private child placing agency:

(a) The court determines by clear and convincing evidence that one or more of the factors in division (E) of this section exist and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.

(b) The child has been in an agency's custody for two years or longer, and no longer qualifies for temporary custody pursuant to division (D) of section 2151.415 of the Revised Code.

(c)     The child does not meet the requirements for a planned permanent living arrangement pursuant to division (A)(5) of section 2151.353 of the Revised Code.

(d)     Prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal custody of the child.

*See also In re H.C.*, 7th Dist. Harrison Nos. 13 HA 5 and 13 HA 6, 2013-Ohio-5871, ¶ 32 ("[T]he R.C. 2151.414(D)(2) best interest test requires the court to find permanent custody is in the child's best interest and commit the child to permanent custody of the agency if the four listed conditions are met.").

{¶ 76} R.C. 2151.414(D)(1) and 2151.414(D)(2) are "alternative means" for determining whether permanent custody is in a child's best interest. *In re J.P.*, 10th Dist. Franklin No. 18AP-834, 2019-Ohio-1619, ¶ 39-40 ("In determining the best interest of a child, a juvenile court may apply one of two different tests. Under R.C. 2151.414(D)(1), the juvenile court weighs multiple factors * * * to decide whether granting an agency permanent custody of a child is in that child's best interest. On the other hand, under R.C. 2151.414(D)(2), if the juvenile court makes the four enumerated findings, permanent custody is per se in the child's best interest and the court 'shall' commit the child to the permanent custody of the agency."); *see also In re M.P.*, 10th Dist. Franklin No. 10AP-478, 2010-Ohio-5877, ¶ 35 ("R.C. 2151.414(D)(2) sets forth the circumstances under which a trial court is required to grant permanent custody, while the court employing the factors in R.C. 2151.414(D)(1) considers them to determine whether the best interests of the children are served in

granting the permanent custody motion."). Where a juvenile court determines that permanent custody is in a child's best interest under R.C. 2151.414(D)(1), the court "need not also conduct [a] R.C. 2151.414(D)(2) analysis." *In re J.P.* at ¶ 40, citing *In re T.P.*, 11th Dist. Ashtabula No. 2018-A-0001, 2018-Ohio-1330, ¶ 27-28. If, however, any of the circumstances enumerated in R.C. 2151.414(D)(2) does not exist, then the juvenile court must proceed to a weighing of factors set forth in R.C. 2151.414(D)(1) to determine what is in the child's best interest. *See, e.g., In re K.H.*, 2d Dist. Clark No. 2009-CA-80, 2010-Ohio-1609, ¶ 54.

{¶ 77} Upon careful consideration of the record, we cannot say that this is a case in which the "remedy of last resort" — termination of Mother's parental rights and granting permanent custody to CCDCFS — has been shown by clear and convincing evidence to be in the best interest of Jo.H. and D.H.-B.

{¶ 78} With respect to the first prong, the agency moved for permanent custody under R.C. 2151.414(B)(1)(d). As Mother correctly observes, the juvenile court failed to make a specific finding regarding R.C. 2151.414(B)(1)(a)-(e) in its December 6, 2018 journal entries granting the agency's motion for permanent custody. However, there is no dispute in these cases that the children had been in the custody of CCDCFS for 12 or more months of a consecutive 22-month period when CCDCFS' second motion for permanent custody was filed. R.C. 2151.414(B)(1)(d). Further, at the outset of the permanent custody hearing, the juvenile court judge specifically asked each of the parties whether the party agreed that these cases were

ones in which "the children had been in custody for 12 out of the 22 [months]." All of the parties agreed.

{¶ 79} With respect to the second prong, i.e., the best-interest determination, the juvenile court determined that granting permanent custody to the agency was in the children's best interest because it found that all of the factors set forth in R.C. 2151.414(D)(2) applied. Mother does not dispute the juvenile court's findings under R.C. 2151.414(D)(2)(b)-(d), i.e., that the children had been in the agency's custody for two years or longer, that the children did not meet the requirements for a planned permanent living arrangement and that no relative or other interested person had filed, or had been identified in, a motion for legal custody of the children. However, Mother contends that the record lacks clear and convincing evidence that R.C. 2151.414(D)(2)(a) applies, i.e., that one or more of the factors set forth in R.C. 2151.414(E) exist and the children "cannot be placed with [Mother] within a reasonable time or should not be placed with [Mother]." We agree.

{¶ 80} In determining whether a child cannot be placed with a parent within a reasonable period of time or should not be placed with a parent for purposes of R.C. 2151.414(D)(2)(a), the juvenile court must consider "all relevant evidence." R.C. 2151.414(E). If the juvenile court determines, by clear and convincing evidence, that "one or more" of the factors set forth in R.C. 2151.414(E) exist as to each of the child's parents, "the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent." *Id.*

{¶ 81} In this case, as reflected in its December 6, 2018 journal entries, the juvenile court evaluated the relevant R.C. 2151.414(E) factors as follows:

(1)   Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.  In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
*the Mother has been unable to consistently remedy the conditions despite the Case Plan Objectives;*

(2)   Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;
*there was no testimony as to any mental health diagnosis for the Mother;*

(3)   The parent committed any abuse as described in section 2151.031 of the Revised Code against the child, caused the child to suffer any neglect as described in section 2151.03 of the Revised Code, or allowed the child to suffer any neglect as described in section 2151.03 of the Revised Code between the date that the original complaint alleging abuse or neglect was filed and the date of the filing of the motion for permanent custody;
*although the Mother was charged with child endangerment, it was not the child herein;*

(4)  The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
*the Mother has not provided for the basic needs of the child;*

\* \* \*

(6)  The parent has been convicted of or pleaded guilty to an offense under division (A) or (C) of section 2919.22 or under section 2903.16, 2903.21, 2903.34, 2905.01, 2905.02, 2905.03, 2905.04, 2905.05, 2907.07, 2907.08, 2907.09, 2907.12, 2907.23, 2907.25, 2907.31, 2907.32, 2907.321, 2907.322, 2907.323, 2911.01, 2911.02, 2911.11, 2911.12, 2919.12, 2919.24, 2919.25, 2923.12, 2923.13, 2923.161, 2925.02, or 3716.11 of the Revised Code, and the child or a sibling of the child was a victim of the offense, or the parent has been convicted of or pleaded guilty to an offense under section 2903.04 of the Revised Code, a sibling of the child was the victim of the offense, and the parent who committed the offense poses an ongoing danger to the child or a sibling of the child.
*the child endangering was a step child; not a biological sibling;*

(7)  The parent has been convicted of or pleaded guilty to one of the following: \* \* \*

(c)  An offense under division (B)(2) of section 2919.22 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to the offense described in that section and the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense is the victim of the offense;
*the Mother was convicted of child endangering for a household member;*

\* \* \*

(10)  The parent has abandoned the child.
*not applicable;*[11]

[11] Although the juvenile court stated, when explaining its reasoning for granting the agency's motion at the permanent custody hearing, that it found the children had been abandoned by Mother, it did not include that finding in its journal entries granting the

*  *  *

(14)   The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.
*the parents are unable to provide for the basic needs of the minor child;*

*  *  *

(16)   Any other factor the court considers relevant.
*not applicable*[.]

{¶ 82} With respect to R.C. 2151.414(E)(1) and the juvenile court's finding that "Mother has been unable to consistently remedy the conditions despite the Case Plan Objectives," the record reflects that Jo.H. and D.H.-B. were removed from Mother's care because she lacked safe, appropriate and stable housing, had made poor parenting decisions by leaving Jo.H. and D.H.-B. alone unsupervised and was unable to provide for the children's basic needs. With respect to Jo.H. and D.H.-B., Mother's initial case plan objectives consisted of obtaining and maintaining appropriate housing, attending parenting classes, completing a drug and alcohol assessment, following up with any treatment recommendations and submitting to random drug screens. The agency later added an anger management program. The record reflects that Mother fulfilled most of her case plan objectives, including those that initially caused Jo.H. and D.H.-B. to be removed from Mother's care. At the time of the permanent custody hearing, Mother had a full time job and had stable and

---

motion. We do not believe the evidence presented at the hearing supported a finding, by clear and convincing evidence, that Mother abandoned Jo.H. or D.H.-B.

appropriate housing. She completed parenting classes, completed a drug and alcohol assessment (twice) and obtained a certificate of completion for an intensive outpatient program. Although the agency noted that were concerns regarding the extent to which Mother "benefited" from the intensive outpatient program, no evidence was presented as to why it was believed that Mother had failed to benefit from the program. Although Mother did not submit to random drug screens for the agency as frequently as the agency would have liked, the evidence shows that Mother submitted to some of the agency's drug screens, that those to which she did submit were negative and that Mother was also submitting to drug screens in connection with her probation. The juvenile court told Mother in February 2017 that she was "not going to make [Mother] do * * * double drug screens" and encouraged the agency to contact Mother's probation officer to see whether some of the drug screens to which Mother submitted for probation purposes could also be used by the agency. May testified that she spoke with Mother's probation officers several times. The record reflects that only once, in late 2016, did Mother test positive for drug use in her probation drug screens. No other evidence was presented at the permanent custody hearing to indicate that Mother was not maintaining sobriety.

{¶ 83} Although Mother did not complete a separate anger management program, anger management was a component of the parenting classes Mother completed. In June 2018, the juvenile court directed the agency to determine the extent to which the parenting classes covered anger management. May testified that she reached out to the service provider and confirmed that the parenting classes

Mother attended addressed "some anger management" but did not determine whether the substance of the anger management programming Mother received as part of her parenting classes was comparable to the substance of the information that Mother would have received if she had completed the separate anger management program. Because the service provider offered a separate anger management program, the agency took the position that Mother needed to complete the separate anger management program in order to comply with her case plan. There was no evidence that Mother had any other issues with anger management following the May 2016 incident involving the child of Mother's boyfriend.

{¶ 84} Based on the record before us, we cannot say that there is "clear and convincing evidence" that Mother "has failed continuously and repeatedly to substantially remedy the conditions causing the child[ren] to be placed outside the child[ren]'s home."

{¶ 85} Likewise, the juvenile court's findings under R.C. 2151.414(E)(4) and (14) that "Mother has not provided for the basic needs of the child" and "the [p]arents are unable to provide for the basic needs of the minor child" are not supported by clear and convincing evidence as they relate to Mother. It is undisputed that Mother had a full time job and stable and appropriate housing. The guardian ad litem testified that she visited Mother's home and that it was "adequate." May testified that Mother was "meeting basic needs in her housing," that "the utilities are working, [and] she always has food." May further testified that Mother had regular, weekly visitation

with Jo.H. and D.H.-B., that there were no issues with her parenting time and that Mother had a "very close relationship" with Jo.H. and D.H.-B.

{¶ 86} Based on the record before us, we cannot say that there is clear and convincing evidence that Mother has demonstrated "a lack of commitment toward the child[ren] by failing to regularly support, visit, or communicate with the child[ren] when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child[ren]."

{¶ 87} With respect to the juvenile court's findings under R.C. 2151.414(E)(6) and (E)(7)(c), there is no evidence in the record that these factors were met. Mother was convicted of attempted child endangering after beating a boyfriend's child with a belt or an extension cord. She was not convicted of R.C. 2919.22(B)(2) or another offense that "is substantially equivalent to [that] offense."[12] There was no evidence that Mother presented any "ongoing danger" to the children or their siblings.

{¶ 88} Thus, we cannot say, based on the record before us, that Mother has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home and that the children "cannot be placed with [Mother] within a reasonable period of time or should not be placed with [Mother]."

{¶ 89} In this case, because the juvenile court found that permanent custody was in the children's best interest under R.C. 2151.414(D)(2), it did not consider

---

[12] R.C. 2919.22(B)(2) states: "No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age * * * [t]orture or cruelly abuse the child."

whether an award of permanent custody would be in the best interest of Jo.H. and D.H.-B. based on the factors set forth in R.C. 2151.414(D)(1).

{¶ 90} Accordingly, the juvenile court erred in determining that termination of Mother's parental rights was in the best interest of Jo.H. and D.H.-B. and in granting the agency's motion to modify temporary custody to permanent custody as to Jo. H. and D.H.-B. Mother's first and second assignments of error are sustained as to Jo.H. and D.H.-B.

{¶ 91} Judgment affirmed as to A.H.; judgment reversed as to Jo.H. and D.H.-B.; Cuyahoga C.P. Nos. AD-15910476 and AD-15910477 remanded for further proceedings consistent with this decision. The clerk's office is instructed to place (1) the transcript of the January 23, 2018 in camera interview and (2) Appellant's Brief and Assignments of Error in sealed envelopes and maintain them as sealed records.

It is ordered that appellant recover from appellee the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

LARRY A. JONES, SR., P.J., and
RAYMOND C. HEADEN, J., CONCUR